UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:20-cr-10011-NMG |
| | ) | |
| | ) | |
| ALEXANDER ESTEVAO | ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

I.  **Introduction**

Alexander Estevao stands prepared to be sentenced by this Court on November 9, 2021. He has accepted responsibility by pleading guilty and entering into a plea agreement that jointly recommends a sentence of 37 months incarceration and four years supervised release. Dkt. 49. The time he has served so far, and the time remaining should the Court accept the joint recommendation, constitutes the first period of incarceration in his life. PSR ¶¶ 47-52. As a first incarceration, it was a particularly severe one due to the necessary restrictions at correctional facilities during the COVID-19 pandemic.

The defense disagrees with the government and probation as to the advisory guidelines range. As explained below, the defense believes that the correct advisory range is 37-46 months, while the government and probation believe the range to be 46-57 months. PSR ¶ 79; Dkt. 49 (government calculation of offense level in plea agreement). The defense thus recommends 37 months as a guidelines sentence, while the government will recommend the same sentence as a

1

downward variance. Under either theory, a sentence of 37 months incarceration and four years

supervised release is one that is "sufficient, but not greater than necessary" under the

requirements of 18 U.S.C. § 3553(a). Such a sentence is also one that is "*minimally* sufficient to

achieve the broad goals of sentencing." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir.

2008) (emphasis added).

II.     **Argument**

A. The offenses should be grouped together because the dangerous weapon enhancement
   should be treated as a specific offense characteristic for the drug counts, resulting in an
   advisory range of 37-46 months.

Mr. Estevao has pled guilty to four counts. Count One, Engaging in the Business of Dealing

in Firearms Without a License, is based on the sale of a firearm to a cooperating witness on July

31, 2019. PSR ¶ 8. Count Two, Possession of Unregistered Firearms, is based on the possession

of two pipe bombs on October 10, 2019. PSR ¶ 16. Counts Three and Four both charge

Possession with Intent to Distribute Cocaine found on Mr. Estevao's person and in his room,

respectively, on October 10, 2019. PSR ¶¶ 11, 13.

Mr. Estevao submits that a preponderance of the evidence shows that a dangerous weapon

was possessed, and thus that two points should be added to the offense level for the drug counts

under USSG § 2D1.1(b)(1). Both the firearm and the pipe bombs are clearly dangerous weapons.

The enhancement does not require the weapon to be possessed "in connection with" the drug

offense, and thus under the plain language of the guidelines the enhancement should apply.

Application Note 11(A) to § 2D1.1 elaborates that the dangerous weapon enhancement

should apply "if the weapon was present, unless it is clearly improbable that the weapon was

connected with the offense." In response to the defense's objection to the Presentence Report, the probation department maintains that the enhancement does not apply under the "clearly improbable" standard. Probation Officer's Response to Defense Objection # 1, PSR p. 27. However, the probation department has construed the "clearly improbable" standard more narrowly than explained by the Sentencing Commission. While the Commission clearly stated that the enhancement should apply unless it is "clearly improbable that the weapon was *connected with the offense*," the probation department argues that it is "'clearly improbable' that the defendant possessed the pipe bombs *in order to protect himself or his drug activities*." Id. (emphasis supplied). The language of protection comes from *United States v. McDonald*, 121 F. 3d 7, 10 (1st Cir. 1997). However, *McDonald* does not require proof that a weapon was used for protection of a drug business. Rather, protection is one way to show that it is not clearly improbable that a weapon found separately from drug materials was connected with the offense. The standard under the guidelines remains simply whether there is a connection with the offense.

In this case, Mr. Estevao sold a firearm on July 31, 2019. PSR ¶ 8. He also was in discussions with the same cooperating witness about selling the pipe bombs in the days leading up to their discovery on October 10, 2019. PSR ¶ 9. The pipe bombs were found at the residence of his girlfriend, where he had been living with her until they had an argument earlier that day. PSR ¶¶ 15, 16. In executing a search warrant at that location, agents found not only the pipe bombs, but drug materials, including plastic baggies, corners cut from plastic bags, and digital scales. Exhibit A, Report of Investigation.

The link between the firearm, pipe bombs, and cocaine is clear- Mr. Estevao was selling all three for profit. The evidence clearly shows that the pipe bombs were stored at the same location

where he stored drugs, likely as recently as the day before all the items were found. This evidence is sufficient to meet the broad standard that a dangerous weapon was possessed and that it is not clearly improbable that there was a connection. Thus, the two-point enhancement should apply.

Application of the enhancement would raise the Adjusted Offense Level for the drug counts from 18 to 20. PSR ¶¶ 31-36. In addition, because the pipe bombs enhance the offense level for the drug counts, the counts would then all be grouped together under USSG § 3D1.2(c). The offense level for the firearm counts would remain 22, but there would be no additional two-point increase for multiple units. PSR ¶ 39. The Combined Adjusted Offense Level should thus be 22. With a three-point deduction for acceptance of responsibility, the Total Offense Level should be 19. Mr. Estevao agrees that he is in Criminal History Category II, where the advisory range at Offense Level 19 is 37-46 months.

B. <u>The offense level enhancements meaningfully account for the nature and circumstances of the offense</u>.

Mr. Estevao acknowledges that he committed a serious offense, and he has accepted that his actions justify serious consequences by entering into a plea agreement that calls for a sentence of more than three years in federal prison. The defense submits that the advisory guidelines range adequately captures the "nature and circumstances of the offense" under 18 U.S.C. § 3553(a)(1) in three separate ways. First, the particularly dangerous nature of the pipe bombs results in an enhanced offense level. PSR ¶ 24. Second, the pipe bombs also result in an additional two-point enhancement because they qualify as destructive devices. PSR ¶ 26. Third, two more points are

added because there were a total of three "firearms" involved in the offense. PSR ¶ 25. The advisory range thus effectively captures the distinction between this case and a "mine run" firearms case.

C.  Mr. Estevao's limited criminal history shows that the recommended period of incarceration will have the intended effect.

Mr. Estevao's prior criminal history consists of two Continuances Without a Finding committed two years before the offense conduct in this case. PSR ¶¶ 46-52. He was never incarcerated before his arrest on October 10, 2019. He now has been behind bars for more than two years as a consequence for his actions. Mr. Estevao submits that the nature of his prior offenses and lack of prior incarceration show that the requested period of incarceration will have a meaningful impact in deterring him from future crimes.

D.  The sentencing factors of just punishment and deterrence are accomplished more quickly during a global pandemic.

An important factor in this case which is not accounted for by the advisory guidelines is the effect of more than 18 months of incarceration during a global pandemic. For that period, Mr. Estevao has served a form of incarceration that has been qualitatively more severe than designed. Imprisonment in normal circumstances allows inmates to move about within the facility for recreation and programming. Normal circumstances allow for regular visits, both with family and with attorneys. Normal recreation, programming, and visits were not possible during the great majority of the pandemic because the paramount concern behind the walls of a prison has been to maintain as much separation between inmates as possible to slow the spread of the virus.

For correctional facilities, the pandemic has meant suspending nearly all inmate transfers and restricting inmates to their units or cells for the great majority of each and every day for many months.

The restrictions that penal facilities put in place to try to slow the spread of the virus made sense. But they also significantly tipped the quality of incarceration away from rehabilitation further towards punishment. Mr. Estevao and all other inmates were deprived of recreation and rehabilitation opportunities. They have generally been confined to their units, and at times to their cell, for extended periods of time. They have also been forced to live with the fear of contracting a potentially fatal disease, without the ability to protect themselves through social distancing. The jointly recommended sentence of 37 months would be sufficient under normal circumstances, but is certainly so given the more severe form of incarceration which Mr. Estavao has experienced.

Unfortunately, the restrictions intended to slow the spread of a deadly virus were not sufficient to protect Mr. Estavao. He has been held at Wyatt during his entire pretrial detention. Although he did not contract the virus during earlier outbreaks at Wyatt, it finally reached him in late September, as confirmed by notification from the United States Marshals. Mr. Estevao reported significant symptoms, including severe coughing, fatigue, difficulty breathing, loss of taste and smell, and lack of sleep for approximately two weeks. He has fortunately recovered now, but learned the lesson that the consequences of his actions can lead to incarceration even during a global pandemic.

E.  <u>Mr. Estevao's large, supportive family will assist him greatly in reentering society and making very different choices in the future.</u>

As the Presentence Report shows, Mr. Estevao has a very limited criminal history. PSR ¶¶ 46-52. His arrest, and the revelations about his conduct, shocked his family. Despite their profound disappointment, they remain committed to him, and six family members, plus his closest friend, have submitted letters of support for him to the Court. Exhibit B.

The letters show how each of the writers has tried to understand how Mr. Estevao came to commit these crimes. They recount coming to acknowledge that he suffered significant emotional abuse as a child. PSR ¶ 58. Tragically, it was only his older sister, who lived the experience together with him, who was fully aware of the abuse at the time. Exhibit B, Letter of Nicole Estevao. Her letter describes for the Court how Mr. Estevao learned to hide his feelings and sought acceptance from peers who appeared to be "fearless and powerful through ignorant ways." Id.  Although most of Mr. Estavao's family has always been very loving, nothing was done to intervene on behalf of the children because the adults did not grasp, or turned away from, the problem. Mr. Estevao, like his sister, agrees that this history of abuse may provide some explanation for his behavior, but certainly provides no excuse.

The letters provide important information about Alexander Estevao the person, apart from his criminal conduct in this case. The writers uniformly describe him as compassionate and supportive, from providing encouragement to his sister in school to bringing his grandmother flowers. Exhibit B, Letters of Michaella Marsall, Efigenia Abella. They also describe his great shame at having put other people at risk through his conduct and having disappointed his family so terribly.

The letters also describe Mr. Estevao's strong work history. See PSR ¶ 74. He began working as a busboy at his aunt's restaurant when he was just twelve years old. PSR ¶ 74. He also spent a summer working at a family farm in Portugal. Exhibit B, Letter of John Estevao. When he moved to Cape Cod as a teenager, he quickly found a job as a dishwasher at a seafood restaurant. PSR ¶ 74. After two years working there, he began working as a painting subcontractor, including for his stepfather. Id. This work history will serve Mr. Estevao well when he returns to society. His father and mother both write of their commitment to finding him stable employment. Exhibit B, Letters of Ilmara Marsall, John Estevao.

Indeed, all of the letters specifically address the writers' willingness to support Mr. Estevao upon his return. In addition to finding employment, they offer to provide emotional support, connections with counseling, and watchful eyes now that they are fully aware of his prior conduct. This particularly large and supportive family is another strong indication that the jointly recommended sentence of 37 months is sufficient.

### III.    Conclusion

Alexader Estavao has accepted responsibility for his offense. He acknowledges that despite his lack of prior incarceration, his actions justify imprisonment now. For all the reasons discussed above, a sentence of 37 months and four years supervised release is one that is "sufficient, but not greater than necessary" to achieve the goals of sentencing. 18 U.S.C. § 3553(a).

Respectfully submitted,
ALEXANDER ESTEVAO
by his attorney

*/s/ Joshua Hanye*
Joshua Hanye, BBO#661686
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061
Joshua_Hanye@fd.org

**Certificate of Service**

I, Joshua Hanye, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.

Date: November 5, 2021                    */s/ Joshua Hanye*_____
                                          Joshua Hanye